**CASUALTY RECIPROCAL EXCHANGE v. PARKER et al. (No. 3463.)\***

Court of Civil Appeals of Texas. Texarkana. Nov. 14, 1927.

Rehearing Denied Nov. 24, 1927.

1. Master and servant ⬦➾405(4)—Finding death of employee, shot by superintendent, was due to cause originating in employment and while engaged therein held warranted by evidence (Workmen's Compensation Law [Vernon's Ann. Civ. St. Supp. 1918, § 5246—82]).

Finding that the death of an ice plant employee, shot by the plant superintendent, was due to a cause originating in his work and while he was engaged in the furtherance of the affairs of his employer, so that dependents were not excluded from compensation by the provisions of Workmen's Compensation Law (Complete Tex. St. 1920, art. 5246—82, or Vernon's Ann. Civ. St. Supp. 1918, § 5246—82), *held* warranted by the evidence.

2. Witnesses ⬦➾363(1)—Jury may consider witnesses' bias in weighing testimony.

A jury may consider the bias of witnesses when weighing their testimony.

3. Master and servant ⬦➾403—Court will not presume employee shot at work was shot while attempting crime.

Where suit was brought by a widow and others for compensation for the death of the husband, shot by plant superintendent while at work, the court will not presume that the employee was shot while attempting to commit a crime, but proof of such claim is required.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by Mrs. Bessie E. Parker and others against the Casualty Reciprocal Exchange, to set aside an order of the Industrial Accident Board denying compensation, and to recover compensation for death of W. O. Parker. Judgment for plaintiffs, and defendant appeals. Judgment reformed, and, as reformed, affirmed.

Lewis & Burr, of Houston, and E. C. Gaines, of Austin, for appellant.

Fouts, Amerman, Patterson & Moore, of Houston, for appellees.

HODGES, J. In March, 1925, W. O. Parker was shot and killed by N. A. Crawford. At the time of the killing Parker was an engineer employed by the Zero Ice Factory, located in Houston, Tex. Crawford was the superintendent of the factory. The Zero Ice Factory was a corporation and a subscriber for an insurance policy issued by the Casualty Reciprocal Exchange under the provisions of the Workmen's Compensation Act. After the death of Parker, his widow, Mrs. Bessie Parker, and his children by a former marriage, filed with the Industrial Accident Board a claim for compensation. The board refused to allow the claim, holding that Parker was killed while attempting to unlawfully injure another, and for that reason did not sustain an injury compensable under the terms of the Workmen's Compensation Act. This suit was filed in the court below by Mrs. Parker, for herself and Parker's children to set aside the order of the board and to recover compensation. The defense is that Parker was shot while he was unlawfully attempting to injure Crawford, and for that reason his injury is not one included in the terms of the Workmen's Compensation Act.

In the trial below, the court submitted only the following issue to the jury:

"Was the shooting of W. O. Parker by N. A. Crawford caused by a willful intention and attempt by W. O. Parker to unlawfully injure the said N. A. Crawford?"

In that connection the court instructed the jury that the burden of proof was on the plaintiffs to establish the negative of that issue. The jury answered the question in the negative. The principal question in this appeal is, Does the evidence support the finding of the jury?

[1] The testimony shows that Crawford shot and killed Parker about 10 o'clock on the morning of March 6, 1925. It was a day when both men were engaged in the performance of their usual duties at the ice plant. Crawford was the only eyewitness to the tragedy who testified on the trial. While he testified at considerable length, the following excerpt contains the material details. He said:

"On the morning of this difficulty I was engaged in raising the density of the brine by adding calcium chloride. * * * The plant had not started that morning, and I had put enough calcium in one tank, I had weighed it out, and I had completed that, and I went to the other tank, and I was down on my knees to read the temperature of the thermometer in the brine tank, because in putting in the calcium it will heat, throw out heat energy, and this particular tank had ice in it, and I had thawed the ice loose in the cans; I was reading this thermometer. * * * Well, I was down on my knees, and Mr. Parker came by directly behind me and commenced cursing and told me to stay out of there, that if he ever caught me in there again he was going to kill me. I got up off my knees, and he went on to the ice vault; I did not open my mouth to Mr. Parker at that time; I was down on my knees and couldn't say anything. He went on to the ice vault, and I went to the platform office. I thought I would just go on and not have any trouble. I had a little place of business of my own, and I was going to it. I had a little feed store, and had a manager out there at that time, and the way it was going it looked like it was our last week. There were a lot of hold-ups going on, and the man that was

⬦➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
\+Writ of error granted February 22, 1928.

working there was continually telling me he was going to get held up. I went out there after 8 o'clock at night and checked up, and I brought a gun from my home this morning; I brought it to my office, and I went in there and went to put on my coat, and it was heavy and I put it in my hip pocket. The evening before I had put in a flange joint from the well, and I noticed it was leaking a little bit, and I thought I better tighten that up; it was only a two or three minute job, and Mr. Parker always ridiculed whatever I did and would try to make it appear to Mr. Irvin that it was a five or six day job. I thought I would go back to the engine room. I thought Mr. Parker was in the ice vault; that is where he was headed when I saw him on the tank. When I got down to the tool board to get two wrenches to tighten that flange, I met Mr. Parker there, and when I met him he commenced swinging at me, and I backed up about 30 feet. There was a Diessel engine running there, and I backed up and had to go through the platform where the belt pit was. He was swinging at me all the time; and I had my arm up like this, and my arm was black and blue where he beat me. All I could see was his feet, and he was running forwards. He missed me and knocked a three-quarter inch pipe off of a compressor before he hit me. I had my arm up like this, and my head down, and I was trying to hold him off with this gun. I had the gun drawn; when he commenced swinging I drew the gun. He hit me on the arms. I was a little taller than he was, and he hit that gun and burst this thumb, and when he did that it made the gun go off. The gun, as you can see, is all battered up where it has been hit. He burst the thumb on the hand in which I had that gun. As to the extent to which that thumb was injured, it was just burst open and bleeding. * * * It was when he hit my hand that the gun went off; that made the gun go off. I was holding it on him all of the time, and he must have hit the gun several times. Mr. Parker hit me on the head, and there is still a little bit of a knot there; one of his blows made a knot on my head. My arm was bruised where he hit me trying to reach over and hit me on the head and the wrench did not reach me. I did not know at that time exactly what Mr. Parker had in his hand; it was so quick, but it was something that he picked up there. From the time Mr. Parker began to advance on me up to the time he was shot, I think I must have retreated something like 20 or 25 feet in the attitude I have described."

A. F. Schade, a witness for the plaintiffs below, testified that at the time of the killing he was employed at the Zero Ice Factory. He had known both Crawford and Parker for some time. The last time he saw Parker was a little before 9 o'clock the day of the killing. He went to the engine room where Parker was, and talked with him while there. Parker did not appear to be angry; he was busy fixing something about the machinery. The next time he saw Parker was a few minutes after the shooting; he was lying dead on the floor of the engine room. Crawford was in the same room, sitting on a crate near by. Witness testified:

"I said to Mr. Crawford, 'What have you done?' He says, 'I have killed him;' and he told me, 'I would have rather have done anything else in the world than that.'"

On cross-examination, witness testified that he had never heard Parker make any threats against Crawford, and had never heard Crawford make any threats against Parker. Witness asked Crawford why he carried a gun, and Crawford gave his reason. He knew that Crawford owned a business and carried money occasionally. Crawford said he carried the gun as a protection against high-jackers. Witness further stated:

"I noticed at that time that Mr. Crawford was hurt. On one of his thumbs, I don't remember which, it was bleeding. I noticed the gun there; it was something like 3 or 4 feet from the body of Mr. Parker. I also saw a monkey-wrench lying there near the body. I testified at the inquest that the gun was lying about 5 feet from the body. * * * There was no question about that being Mr. Crawford's gun."

Stephen Hebert, another witness who was an employee of the ice factory at the time of the killing, testified that he saw Parker in the engine room just a little while before he was shot. Witness said:

"I talked to Mr. Parker two or three times in regard to the relations between him and Mr. Crawford; the last time I talked to him about that matter was probably two or three days before the killing. In a general conversation bearing on that matter he said that Mr. Crawford was interfering with the machinery; that Mr. Irvin told him that Mr. Crawford would soon not interfere with the machinery at all. He said that he (Parker) could not handle the machinery like it should be with Mr. Crawford messing around with the machinery; that he was hoping that he would not have to contend with Mr. Crawford messing around with the machinery any longer. I don't recall that Mr. Parker made any statement to me about Mr. Crawford's attitude towards him at that time, or any other time before the killing. His conversation was more along the line of Mr. Crawford interfering with the machinery, and messing around with the machinery, and keeping it out of order when he had it in order. Frequently when he was not there Mr. Crawford would interfere with the machinery, and when he would come back that particular machinery would be out of order. That was the substance of the conversation. * * * I was in the office at the time the shot was fired. I judge the office is about 75 feet from the engine room. * * * The machinery was running, and the first thing that attracted my attention was when Mr. Crawford came to the window and made a statement about the incident. He said, 'He is down,' or something to that effect. I did not understand all he did say. I think he said, 'He is down, look after him; I told him that would happen;' something like that. * * * I ran down to the engine room right away, and the first thing I saw was Mr. Parker lying flat on his back, with both hands drawn up to the side,

just as if they had been put there. * * * Mr. Crawford appeared very nervous, excited, and angry, and he was carrying on in an excited manner, popping his fingers. He made the statement, 'I told him that would happen,' and a few other statements in a very excited manner along that line. I saw Mr. Crawford on one or two occasions before the day of the killing when I supposed him to be angry and nervous on account of other little things that had happened around there. On this occasion immediately after the killing I think Mr. Crawford was as angry as I ever saw any one. Mr. Parker was lying flat on his back, with his feet straight out and both hands by his side just as if he had been put there, and the gun was about 15 feet from his left side."

W. H. Irvin, a witness for appellant, testified that he was the head of the Zero Ice Factory. Crawford was his nephew and was the superintendent of the factory. Some months before the killing Crawford had employed Parker as an engineer. Witness had given instructions the day before the killing for the machinery to be started early the next morning in order to have a supply of ice ready to be sent out on the wagons. He said:

"I went to the plant early the next morning to see that the plant got started early. Mr. Parker did not get down early, and it kind of worried me because he was the one that started the plant. He did get down about 8 o'clock, when he should have been there about 7. * * * I figured it would take him an hour to get all the machinery running, and at 9 o'clock there were no machines running at all; at 9:30 I went down to see why the machines had not started. This is the day of the killing that I am talking about. When I went into the engine room, Mr. Parker was very mad, but I didn't know it when I went there. There wasn't anybody there with him but one of the darkies, who was up on the little engine adjusting one of the valves. I said, 'When are you going to get off?' And he said, 'You get out of the engine room and go back to the office, because I am going to hang a pipe around a (profane language) neck in a few minutes, and I will drag him up there, and you have my time ready for me.' There wasn't anybody in there at that time but the darky; he was a big, husky young fellow, and I figured he would take care of himself, so I went on back to the office and didn't go back to the engine room, and this accident happened a short time after that. I know where Mr. Crawford was at the time I had that conversation with Mr. Parker. Mr. Crawford had a bunch of Mexicans and negroes working. We had to strengthen our calcium; it was down to about 75, and it should be about 80. We had about 75 drums of calcium to be chopped up out in front of the tank room. I said to Crawford: 'We are not running; you be very careful as you put this calcium chloride in, and put it in there slow, because it boils when it comes in contact with the water. You are liable to get that gas in the drums boiling, and you will blow up the plant. You watch the thermometer.' And he said he was watching it. He had to watch the thermometers very closely. If the plant was running and the drums were cool, it would be all right, but if the ammonia is still and you heat it it will blow up. He went in to watch the thermometers, and he would tell the darkies when not to put any more in. In a short while—I don't remember exactly the time —Mr. Crawford came to my window near where these men were at work, and I noticed he was bleeding, and he was excited, and he said, 'Uncle Wade, call an ambulance; Mr. Parker tried to kill me, and I had to kill him.'"

W. M. Wooley testified for appellant that at the time Parker was killed he was an employee in the Zero Ice Factory, and was acquainted with both Crawford and Parker. He stated that beginning about a week or ten days before the tragedy occurred he heard Parker talking about matters relating to the engine room and Crawford. On one occasion Crawford was fixing a pipe that ran from the well into the engine room. Witness was working on the platform at the time. Parker told him that Crawford did not have sense enough to do the work; he said that after dinner he (Parker) was going to fix the piece of machinery, and that, if he (Crawford) came around there and said anything about it he would pick up one of those Stillsons and beat his brains out or break it. That statement was made about two or three weeks before the killing. He had heard Parker refer to Crawford on several other occasions, in which he derided Crawford's capacity to do the work around the plant. Parker talked about Crawford abusively, and threatened that, if he (Crawford) "fooled" with him he would take a piece of pipe or a wrench and "break his damn neck." In referring to Crawford, Parker always referred to him in an abusive way, and said that Crawford should be down in the river bottom somewhere chopping cotton or corn; that he did not have any more business being superintendent than a dog; that if he (Parker) went to do anything and Crawford crossed him a bit he would take a piece of pipe or a wrench and beat his brains out. Witness further testified that he talked with Parker on the morning of the killing. They were putting in a sprinkling machine. Parker came out on the platform and invited witness to go back with him and take a drink of whisky. Witness said:

"I told him that I didn't want any, and he said for me to come on, and I told him again that I didn't want any whisky, and he said: 'Come on; if you don't I won't think you are my friend.' I went down under the tank with him, and he says: 'I will get through under here to-morrow, and I am coming out and I will have full charge of the plant, instead of the engine room and the tank, and that —— (using very abusive language referring to Crawford) better not come inside of the plant. I am not going to allow him inside. If he comes in there I am going to take a piece of pipe or a wrench and beat his —— brains out.' At that time Mr. Parker had some whisky there; I know that because I saw it. He had a gallon glass

jug about half full of whisky. When Mr. Parker would come to work in the mornings I would always speak to him, and on the morning of the killing I spoke to him and said: 'Good morning, Mr. Parker, how are you?' He said: 'I am all right. I am about an hour late, but that don't make any difference; I am going to kill some ——— before 10 o'clock.' I don't remember exactly what time it was when Mr. Parker made that statement, but it was somewhere between 7:30 and 8:30. I don't remember to have said anything more to Mr. Parker that morning before the killing. I never did hear Mr. Crawford make any statement reflecting on or criticising Mr. Parker. In fact, I never heard him criticise anybody. The hardest thing I ever heard him say about any one was: 'I have been good to somebody and I don't see why they want to treat me that way.' He told me that about Mr. Parker one time, but I did not tell him anything Mr. Parker had said."

Witness further testified that Parker was a man of high temper and easily irritated.

C. E. Hoppins testified for the plaintiffs, in rebuttal, that he knew of the killing of Parker, was working at the ice factory at that time. He was with Parker a short time on the morning of the killing, and about two hours before that occurred. He did not smell whisky on Parker's breath. Witness said he went to the engine room just after Parker was shot. Parker was lying on the floor, with his feet towards the tool board and his head towards the switch board. He did not see any wrench lying there near Parker's body, but did see a gun lying over the compressor. He noticed that Parker had been shot once in the jaw; that is the only place he saw; he did not know whether he had been shot in the body or not. On cross-examination, he stated that he had seen Parker drink on a former occasion, but that Parker told him that he had quit, and he saw nothing in Parker's manner the morning of the killing to indicate that he was drinking. Witness admitted that at the inquest previously had he had testified that Parker was a strong, vigorous, blustering man, who was quick-tempered and easily angered, and that was true to a certain extent. He heard Parker making some threats on the morning that the killing occurred. He was talking about the water leaking out of his tank, and he knew some one had let it out. He said the first one he found "fooling" around those valves he would throw him in the bayou. Witness did not know to whom he referred.

Will Brown, a witness for plaintiffs in rebuttal, testified that he was an employee at the time of the killing. He had been working under Parker around the engine room about eight months. Parker seemed to be a good man. The first time he saw Parker on the morning of the killing he was down in the engine room. There was something wrong with a little pump, and Parker was working on that, with witness helping. Witness was not in the engine room at the time of the killing. Mr. Parker had sent him to the front for some matches. Parker did not seem to be mad at that time. There was nothing unusual about him to attract attention. Witness started out in obedience to the instruction, went up the steps onto the platform, and crossed the tank, towards the little office. He met Crawford coming in at the door into the tanks. That platform was on the front of the building, and down a little farther was the door into the tanks. He was about 10 or 15 steps from that door when Crawford passed through. Witness said:

"I went to Wooley's office to get the matches, but he wasn't in there at that time. I turned to go back to the engine room, and when I got to the door I heard two shots. I was getting into the door when I heard those shots. I had not seen Mr. Irvin down in the engine room that morning. I was down there in the engine room just about all the morning. * * * I didn't hear Mr. Parker cursing anybody down there that morning. I didn't hear Mr. Parker tell Mr. Irvin to get out of there, that he was going to wrap a pipe around some ———'s neck and drag him to the office. I didn't see Mr. Irvin down there at all that morning."

Witness further testified that he did not know of any whisky kept by Parker under the tanks. He saw Parker take a drink about a month before he was killed, but did not see him drink any between that time and the time of the killing.

Mrs. Parker testified that her husband was not a drinking man, that she had never seen him under the influence of liquor, nor had she ever heard him accused of being under the influence of liquor until the trial. Other witnesses testified to Parker's good character, sobriety, and peaceable disposition.

In addition to his testimony previously quoted, Crawford detailed a number of instances prior to the killing when Parker had indicated great ill will toward witness. There was other testimony introduced by both parties, but it may be regarded as mainly cumulative of that which has been quoted. It appears that Crawford had been indicted, but the case against him had been dismissed.

The provision of law upon which the appellant relies appears as a part of article 5246—82, Complete Tex. Statutes of 1920, or Vernon's Ann. Civ. St. Supp. 1918, § 5246—82, which is as follows:

"The term 'injury sustained in the course of employment,' as used in this act, shall not include:

"1. An injury caused by the act of God," etc.

"2. An injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment.

"3. An injury received while in a state of intoxication.

"4. An injury caused by the employee's willful intention and attempt to injure himself, or to unlawfully injure some other person, but shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

Since the principal attack in this appeal is on the finding of the jury, it becomes necessary to analyze and discuss the evidence relied on to support the verdict. While there was ample testimony to support an affirmative answer to the interrogatory submitted by the court, the jury answered in the negative. The judgment rendered involves a further finding of fact made by the court that the death of Parker was due to some cause originating in his work and while he was engaged in the furtherance of the affairs of his employer. If the finding of the jury is supported by the evidence, we think it may be said that the conclusion of the court was also warranted by the facts. Indemnity Ins. Co. of North America v. Scott (Tex. Civ. App.) 278 S. W. 347.

It is conceded in this appeal that Parker was shot and killed by Crawford. According to the testimony of Crawford, Parker was the aggressor, and the killing was in self-defense. But was the jury compelled to accept that version of the killing? We think not. There was testimony tending to corroborate what Crawford stated with reference to Parker's ill will toward him. There was also testimony other than his own that Crawford had received a blow on his finger. Crawford testified that Parker had assaulted him with a wrench, and a wrench was found on the floor near the body of Parker after the killing. In addition to these facts, other witnesses had testified to threats made by Parker against Crawford just a short time before the killing.

[2] That Crawford was interested in giving a version of the encounter favorable to himself and unfavorable to Parker cannot be denied. Crawford had never been tried for the killing, and was still subject to indictment and prosecution for an unlawful homicide. He was also interested in protecting himself from public censure for having killed a man without legal or moral justification. These considerations warranted the jury, while weighing his testimony, to reject that which was favorable to himself and accept as true only that which was unfavorable. Two witnesses testified to threats made by Parker on the morning of the killing. One of them, Irvin, was an uncle of Crawford; and the other, Wooley, was a former employee of the ice factory. In addition to his relationship, Irvin had raised Crawford and would naturally be interested in Crawford's welfare. That interest and relationship was sufficient to affect Irvin's credibility in weighing his testimony. Moreover, Irvin was to some extent contradicted by Brown, who testified that he was in the room with Parker that morning and did not see Irvin come there and did not hear any conversation such as that detailed by Irvin. Wooley, the other witness referred to, admitted on cross-examination that he had talked to the attorneys representing appellant about what he knew, but had refused to talk to the attorney on the other side "because I did not think it was any of his business." That refusal would indicate a bias which the jury might consider in weighing the testimony of Wooley. What Wooley said as to Parker's drinking liquor on the morning of the killing is in conflict with the testimony of other witnesses. There is abundant evidence in the record of ill feeling on the part of Parker against Crawford. But that ill feeling merely tended to show a motive for an assault on Crawford by Parker. It is not necessarily inconsistent with an aggressive attack by Crawford on Parker. It is only natural to assume that this hostility on the part of Parker provoked corresponding hostility on the part of Crawford.

There are some facts stated by Crawford which, without the explanations he gave, would be entirely consistent with an assault by him on Parker. He testified that on this particular morning he carried a pistol with him; that after the abuse by Parker, while he (Crawford) was under the tank, he reentered the engine room to make a small repair which the evidence shows might have been made by Parker. The jury might have concluded that Crawford was smarting under the insults which had been uttered by Parker, and that he armed himself and reentered the engine room for the purpose of assaulting or killing Parker. Crawford's manner and statements just after the killing indicated that he was very angry, and that he had previously told Parker that this very thing would happen. Wooley testified that when he first saw Parker after the killing he was lying just as a body would naturally fall after a fatal shot. Two other witnesses who apparently saw the body about the same time, or before, testified that Parker was lying on his back, with his hands by his side, just as if "he had been put there." One witness stated that two shots were fired. That fact is somewhat inconsistent with Crawford's statement that he did not intentionally shoot Parker; that the fatal shot resulted from a blow on the pistol delivered by Parker with a wrench. That statement of Crawford's as to an unintentional shooting is, in effect, contradicted by the exclamations uttered by him immediately after the killing, such as, "I told him that would happen."

[3] When it was shown that Parker had been intentionally killed by Crawford, we do not think the plaintiffs in the case were required to further prove that Parker was not at the time engaged in making an unlawful assault on Crawford. In the absence of evidence to the contrary, it will not be presumed that Parker when shot was attempting to commit a criminal offense. After Crawford's testimony incriminating Parker, it might have been necessary for the plaintiffs to introduce contradicting testimony in order to convince the jury that Parker was not guilty of having made the assault. But such rebutting evidence was not essential to enable the jury to discredit what Crawford had said in justification of the shooting. The jury might have reached that conclusion after considering all the facts and circumstances.

Complaint is made that the judgment rendered in the court below allowed interest on the installments due prior to the trial, because no interest had been asked for in the original petition. Appellees have filed a supplemental brief, in which it is conceded that the judgment is erroneous in that respect.

The judgment will therefore be reformed, and as reformed, affirmed. The costs of the appeal will be adjudged against the appellees.